IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 2:08cr197-MHT |
| CAROLINE NYALESO OWUOR TODD | ) | (WO) |

OPINION

After a jury trial, defendant Caroline Nyaleso Owuor Todd was convicted of two counts of perjury, in violation of 18 U.S.C. § 1621(2), and one count of fraud and misuse of visa, permits, and other documents, in violation of 18 U.S.C. § 1546(b)(3).  The charges were based on information Todd submitted in two documents affecting her immigration status and ability to work in the United States.  At sentencing, Todd requested a downward variance from her Sentencing Guidelines range of 15 to 21 months.  The court determined that a variance was warranted and sentenced Todd to three years of probation.  The court orally gave its reasons for the variance and

promised that it would issue a written opinion setting forth its reasons in more detail.  This is the promised opinion.

I. BACKGROUND

The court was deeply troubled by the circumstances of this case.  Todd, who was born in Kenya, came to the United States in 1990 on a student visa.  She was only 18 years old.  Todd spent the next two decades creating a family and setting down roots in this country.  In 1996, she married a United States citizen.  A short time later, the couple had their first child.  They had a second child four years later.  Todd's primary work has been caring for her family, and it is clear that she has maintained a close and loving relationship with her children.  Her boys, now 8 and 12, are well-behaved and have excelled in school under her guidance.  Todd's close relationship with her husband and children was apparent at every hearing before this court.

Todd has also worked outside the home to help support her family, and earned an associates degree in medical assisting in 2000. Todd has been active in her church and community as well, as evidenced by the many letters submitted in her support.

Todd's record is unblemished by any other conviction.[1] Indeed, but for her arrest and conviction in this case, Todd would likely have been eligible for adjustment of her immigration status based on her lengthy marriage to a United States citizen. It is not perfectly clear how Todd came to the attention of law enforcement authorities. According to Todd's immigration attorney, she became the subject of a federal investigation shortly after she tried to intervene in a case involving her brother, who had filed a lawsuit against immigration agents claiming that he was injured during an interrogation.

---

1. In 2000, Todd was charged with writing bad checks, but the charges were nol-prossed.

Regardless of how Todd came to be the subject of any investigation, the government ultimately charged Todd with six separate counts based on two documents in which she allegedly provided false information.  The government alleged, first, that, in August 2006, Todd filed an "Application to Register Permanent Residence or Adjust Status," on which she indicated that she had never been arrested or charged for breaking any law, when, in fact, she had been arrested six years earlier.  Based on this representation, Todd was charged with making fraudulent statements in an application for registration, perjury, and mail fraud.

Second, the government alleged that, in April 2007, under penalty of perjury, Todd filled out an "Employment Eligibility Verification" on which she marked a box claiming she was a United States national or citizen, when she knew that she was not.  Based on this single form, the government charged Todd with false

impersonation of a United States citizen, fraud and misuse of visa or permits, and perjury.

At trial, the court dismissed, for lack of evidence, the counts charging Todd with making fraudulent statements in an application for registration and with false impersonation of a United States citizen.  The jury acquitted Todd of mail fraud but convicted her of perjury (in relation to both forms) and fraud (in relation to the employment form).

Todd now faces the possibility that she will be deported to Kenya, a country she has not lived in for the past 20 years.  Indeed, upon Todd's conviction, immigration authorities immediately took her into custody and placed her in detention.  Since January of this year, Todd has been incarcerated in an immigration-detention center in Jena, Louisiana, nearly eight hours from her family, which is in Montgomery, Alabama.

At sentencing, the court calculated Todd's Sentencing Guidelines range as 15-21 months, based on an offense

level of 14 and a criminal history category of I. The government sought a sentence between 18 and 21 months. Probation recommended 15 months. Todd requested, and the court granted, a variance down to a sentence of probation. Todd based her request on her lack of criminal record; her demonstrated closeness to her family and community; her detention by immigration authorities since January; and an argument that she was forced to go to trial because the government "overcharged" the case, as evidenced by the court's dismissal of two of the charges and her acquittal on a third. The court considered these and other factors, as explained more fully below, in granting Todd's request.

## II. DISCUSSION

### A. Sentencing considerations and the 18 U.S.C. § 3553(a) factors

Although district courts are no longer bound to follow the Sentencing Guidelines after <u>United States v. Booker</u>, 543 U.S. 220 (2005), they still must consult the

Guidelines and take them into account when sentencing defendants. United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005); see also 18 U.S.C. § 3553(a)(4) & (5). After calculating the correct Guidelines range, the court may impose a more severe or more lenient sentence, as long as the sentence is reasonable. Crawford, 407 F.3d at 1179. The factors set forth in 18 U.S.C. § 3553(a) continue to guide sentencing and will necessarily inform whether a sentence is reasonable.[2] Booker, 543 U.S. at 261-62. The primary goal of sentencing is to impose a sentence that is "sufficient, but not greater than necessary" to punish the offender,

---

2. Section 3553(a) requires courts to consider: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to punish the offender, protect the public from the defendant, rehabilitate the defendant, and deter others; (4) the kinds of sentences available; (5) the sentencing range established by the Sentencing Guidelines; (6) any pertinent policy statements issued by the Sentencing Commission; (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (8) the need for restitution. 18 U.S.C. § 3553(a).

7

protect the public from further crimes by the defendant, rehabilitate the defendant, and deter other people from committing similar crimes. 18 U.S.C. § 3553(a). Section § 3553(a) explicitly requires sentencing courts to consider whether the sentence will "reflect the seriousness of the offense, ... promote respect for the law, and ... provide just punishment for the offense." The court's concerns in this case related precisely to these considerations; in nearly three decades on the bench, this court has rarely, if ever, heard a case that so clearly warranted a downward variance.

B. Application of the § 3553(a) factors to this case

1. Cultural assimilation

First, the court determined that Todd's cultural assimilation to the United States was substantial. In the context of illegal reentry cases, courts are permitted to consider the degree of the defendants' cultural assimilation when deciding whether a 'departure'

downward is appropriate.  See United States v. Sanchez-Valencia, 148 F.3d 1273, 1274 (11th Cir. 1998) (acknowledging district court's authority to depart downward in illegal-reentry cases based on cultural assimilation); United States v. Reyes-Campos, 293 F.Supp.2d 1252, 1255-57 (M.D. Ala. 2003) (Thompson, J.) (granting downward departure based on cultural assimilation).  The reasoning, made in the context of the demanding standards for departures, governed by the Guidelines at §§ 4A1.3 and 5K2, may be informative with respect to a variance based on the § 3553(a) factors. Cf. United States v. deVegter, 260 Fed. Appx. 240, 242 (11th Cir. 2008) ("[T]hat the district court varied downward where we would not depart downward does not significantly concern us.  A downward departure implicates the appropriate calculation of the Guidelines range, while a downward variance implicates consideration of the factors set forth in 18 U.S.C. § 3553(a).").

Courts may consider cultural assimilation in the departure cases because a defendant's cultural assimilation to the United States may "speak to [her] offense and to [her] character. United States v. Limpan, 133 F.3d 726, 731 (9th Cir. 1998). "Cultural assimilation may be relevant ... if a district court finds that a defendant's unusual cultural ties to the United States--rather than ordinary economic incentives--provided the motivation for the defendant's illegal reentry." Id. "Cultural assimilation may also be relevant to the character of a defendant ... insofar as [her] culpability might be lessened if [her] motives were familial or cultural rather than economic." Id. Courts rely on various factors in considering whether a defendant's conduct in an illegal-reentry case was motivated by familial ties, including: "(1) the length of time the defendant lived in the United States; (2) the defendant's level of familiarity with [her] country of origin; (3) the defendant's family ties; and (4) what the

defendant did and where [s]he went upon re-entry." Reyes-Campos, 293 F. Supp. 2d at 1257 (quoting United States v. Martinez-Alvarez, 256 F. Supp. 2d 917, 920 (E.D. Wis. 2003) (Adelman, J.)) (quotation marks omitted).

The reasoning of these illegal-reentry cases is equally instructive in other cases where the offense conduct may similarly have been motivated by a desire to return to or remain with family. As in those cases, Todd's offense conduct related solely to her desire to remain in the United States with her husband and children. It was only in the course of attempting to correct her status to allow her to remain in the United States legally, and to obtain lawful employment despite being out of status, that Todd submitted false information. In these circumstances, the reasoning underlying the illegal-reentry cases is equally compelling.

11

Applying the factors outlined above, the court was persuaded that Todd's offense conduct was motivated solely by her exceptional cultural and familial ties to this country.  First, as noted above, Todd has spent her entire adult life--nearly 20 years--in the United States.  Second, Todd is unfamiliar with Kenya as a result of the substantial time she has spent away from that country.  Third, Todd has deep family ties in this country--a husband of nearly 15 years and two young children, all of whom were born and raised in the United States.  The fourth factor, where the individual went and what she did upon reentry, is not strictly applicable outside the context of illegal reentry.  In this case, the analogous inquiry was whether there was any evidence that Todd's reasons for remaining in the United States were her cultural and familial ties, or something else.  In other words, did Todd's actions support her assertion that she was motivated by a desire to maintain cultural and familial ties?  The answer could not be clearer: Todd's

years of dedication to her family and the family's obvious closeness spoke to her purpose in remaining in the United States. There was no hint of any motivation other than Todd's close ties to her husband of many years, her young children, and her community.

All of these factors persuaded the court that Todd's cultural and family ties in this country were exceptional, and that these exceptional bonds were the sole motivation for her offense conduct. Thus, Todd's cultural and familial ties supported her request for a downward variance.

2. Other § 3553(a) considerations

In addition to Todd's cultural and familial ties, the court relied on other § 3553(a) considerations in evaluating whether a downward variance was appropriate. First, the court found that the most powerful deterrent and punitive effects of Todd's conviction were already accomplished before she came before the court for

13

sentencing. In the most literal way, Todd's true punishment is that she has been separated from her home and family--her two young children and her husband of nearly 15 years--solely because of her efforts to remain here and be a productive member of her community. Her offense, which did not harm anyone, has resulted in her detention in the custody of immigration authorities--in Jena, Louisiana, far from her children--and facing possible deportation to Kenya. Equally importantly, Todd is not the only person who has been punished. Two young children are now separated from their mother, a woman who has lived in the United States for nearly 20 years.

Second, a sentence of imprisonment would affect Todd's ability to remain in this country. Although the court would reach the same conclusion even if Todd's immigration status would remain unaffected by her sentence, the fact that a sentence of imprisonment could prevent Todd from remaining or returning to the United States certainly supports the court's determination that

a Guidelines sentence of imprisonment would be excessive and unnecessary in this case.

Third, Todd has already served four months in the custody of immigration authorities, and her attorney in her immigration case has credibly informed the court that she will likely remain in custody for some additional amount of time as her immigration proceedings move forward.  The probation department informed the court that the Bureau of Prisons generally does not credit defendants for time served in immigration custody, although it routinely credits defendants for time served in the custody of local and federal authorities pending trial and sentencing.  This leads to the perverse result that criminal defendants who are also subject to immigration detainers, but who are determined by courts not to be flight risks on their criminal charges, are not credited for the time they spend incarcerated pending determination of their immigration status.  Where, as here, the conduct that forms the basis of the criminal

offense is closely related to the conduct that forms the basis for action by immigration authorities, it is particularly unreasonable to fail to consider the time spent in immigration detention.

Moreover, although a sentence of probation is certainly lighter than a lengthy term of imprisonment, it would be naive to ignore the very real burden of a three-year sentence of probation.  For three years, Todd will be under the supervision of the court.  Among many other conditions, for three years Todd will be required to submit a monthly report to probation officers; report regularly to a probation officer; remain in this district unless she has permission from her probation officer to leave; be subject to a potential search of her home; and submit to DNA testing.  Perhaps most importantly, violation of any these conditions will subject Todd to a threat of imprisonment.

Finally, Todd presents no danger to the public, as her offense did not directly or indirectly harm any other

person; she has never been convicted of any other crime; and, in fact, she has been an active and productive member of her community and a devoted mother to her children.

For all of these reasons, the court was satisfied that, in this unusual and sad case, a variance down to a sentence of probation was appropriate to satisfy the factors reflected in 18 U.S.C. § 3553(a).

DONE, this the 29th day of May, 2009.

      /s/ Myron H. Thompson
**UNITED STATES DISTRICT JUDGE**